Filed 9/27/16  In re C.G. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re C.G. et al., Persons Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMIE G.,<br><br>        Defendant and Appellant. | A145626<br><br>(Humboldt County<br>Super. Ct. Nos. JV140224, JV140226) |

        Jamie G. (Mother) and Alex G. (Father) are the parents of C.G. (Daughter) and D.G. (Son).  At the outset of this case, Father was a noncustodial parent of one-year-old Daughter and a custodial parent of five-year-old Son.  The juvenile court sustained petitions removing both children from Mother's care based on mental health and substance abuse concerns.  Mother appeals an order terminating dependency jurisdiction after placement of both children with Father.  The court's exit orders granted custody to Father and visitation to Mother.  Mother argues the court should have retained jurisdiction and continued to provide her with services to facilitate visitation.  We reject an argument by the Humboldt County Department of Health and Human Services (Department) that the appeal is moot because of a subsequent stipulated custody and visitation order in the family court.  We affirm the juvenile court order on the merits.

1

# I.  BACKGROUND

In the fall of 2014, Mother and Father were living separately in Eureka.  In early December, the police were notified after Mother called staff at the University of California, San Francisco to cancel a medical appointment and said "she was in a motel with [Daughter] and had to stay there so [they] did not infect anyone.  [Mother] said, 'I can't handle it anymore,' 'I don't think we are going to make it.'  [She] said there were bugs crawling under her and her child's skin and coming out of the child'[s] eyes and ears.  [She] said the child had a 'green glowing stuff' coming from her body the previous night that [she] looked at under a microscope and saw it was 'hexagonal and shining like crystal.' "

After Mother and Daughter were located in a Santa Rosa hotel, Sonoma County Child Welfare Services investigated and reported that Mother "moved out of her home [in Eureka] because she thought she and the baby were being infected by bugs in her home and she ha[d] been staying in hotels in the Eureka area.  Today [Mother] took the baby and drove to Santa Rosa to find new medical providers . . . [and] checked into [a motel] in Santa Rosa. [¶] . . . [¶] . . . [Mother] seem[ed] too preoccupied with the undiagnosed disease that she does not attend to the cues of the baby, and is not feed[ing] the baby when the baby is clearly hungry.  Today the baby had one packet organic pureed food to eat and the baby was crying from hunger.  Mother had to be prompted several times to nurse the baby. [¶] . . . Mother made [a] statement to the mental health workers: 'I should have stayed in Eureka and let my baby die.' "  Mother was deemed a flight risk.  "While [an] officer called for the mobile crisis unit [Mother] was packing her car to leave."  Father said Mother suffered from mental health problems including a history of depression.  When they separated about nine months previously, "she was acting irrational but always came back to her senses after awhile. . . . [I]n the last few days, [Mother] ha[d] been doing very badly and she ha[d]n't come back."  Father did not intervene because he hoped she would get better, and he was concerned about a custody battle.

The Department filed a juvenile dependency petition on behalf of Daughter pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[1] On December 5, 2014, the court detained the child from Mother and gave the Department discretion to place her with Father. The Department visited Father's home, assessed it as safe, and placed Daughter there. Son was already living with Father. The parents were married in 2005, and Mother moved out in 2014, about four months after Daughter was born. They shared physical custody of Son, but he had been staying full-time with Father for about a month because Mother, who was a nurse, claimed Daughter had lice. Mother did not stay in contact with Son during this period. Father was concerned Mother might be using drugs and said she talked about taking both children away from Humboldt County.

The Department filed a petition on behalf of Son pursuant to section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling) based on the facts underlying his sister's petition plus the allegation that Mother had tested positive for methamphetamines, opiates and THC on December 4, 2014.[2] The court detained Son from Mother and placed him with Father.

In December 2014, Mother told the Department that Father had been financially and emotionally abusive toward her, and she left when he became verbally abusive toward Son. Mother believed Father would use "high powered attorneys" to take the children away from her "as punishment for leaving the abusive relationship," and she accused him of trying to take her car. Son told the social worker, "Daddy is mean to us for no reason." When asked to elaborate, however, Son said Father yelled and used time outs when the child said prohibited words.

Mother told the social worker she believed she was suffering from end-stage Lyme disease. She had lost 50 pounds in a month and had fever, pain, heart palpitations, very low blood pressure, and compromised cognitive functioning. She was seeing a Lyme

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Daughter's petition was amended to include this allegation as well.

3

disease specialist in San Francisco, Dr. Raphael B. Stricker, who took her concerns seriously. Mother had prescription medication for Lyme disease and a written diagnosis, dated the day after Daughter's removal, for Lyme disease from Dr. Stricker's office. Mother said she was previously diagnosed with narcolepsy and hyperthyroidism and did not have access to her medications for those conditions. She also suffered from chronic back pain. She recently used methamphetamine to stay awake on trips to San Francisco for medical care because she did not have her regular narcolepsy medication. She also used medical marijuana with a valid recommendation. The social worker wrote, "At this time it is unknown if [Mother's] behavior is due to a mental health issue, drug use, or a disease."

Mother sought dismissal of both children's petitions, arguing the Department had not established she had mental health problems and a single positive test for methamphetamine was insufficient to support jurisdiction. At a January 7, 2015 jurisdiction hearing, the court sustained both petitions.

In a January 2015 disposition report, the Department attached a December 12, 2014 letter from a family nurse practitioner, Melissa C. McElroy. The letter, on Dr. Stricker's stationery, stated: "[Mother] is under my care for the treatment of Lyme disease and its associated co-infection, Morgellons. Her symptoms include severe joint pains, muscle aches, peripheral neuropathy, 'brain fog' and memory loss, insomnia, fatigue, and skin lesions. [She] requires treatment with antibiotics and anti-parasitics to treat the underlying infection, as well as medications to control her symptoms. . . . Anticipated resolution is guarded at this point." The Department was not able to confirm the diagnosis with Dr. Stricker directly. A printout from WebMD was attached to the disposition report and described Morgellons as "a controversial and poorly understood condition in which unusual thread-like fibers appear under the skin. The patient may feel like something is crawling, biting, or stinging all over. [¶] Some medical experts say Morgellons is a physical illness. Others suggest it is a type of psychosis called 'delusional parasitosis,' in which a person thinks parasites have infected their skin." A Centers for Disease Control and Prevention (CDC) description of a study of Morgellons

4

(also attached to the disposition report) concluded that "[s]kin damage from the sun was the most common skin abnormality found [among suspected Morgellons patients], and no single underlying medical condition or infectious source was identified. Upon thorough analysis, most sores appeared to result from chronic scratching and picking, without an underlying cause. The materials and fibers obtained from skin-biopsy specimens were mostly cellulose, compatible with cotton fibers. [¶] Neuropsychological testing revealed a substantial number of study participants who scored highly in screening tests for one or more co-existing psychiatric or addictive conditions . . . ."[3] The Department recommended Mother complete a mental health assessment. The Department also recommended the children and Father be tested to verify they were free of Lyme disease, although Daughter's pediatrician opined that she did not have Lyme disease. The

---

[3] A report from a public health nurse was admitted as evidence at the jurisdiction and disposition hearing. That report quoted a different CDC Web page on standards for diagnosing Lyme disease via blood tests. Mother asks us to take judicial notice of the entire CDC Web site.

We deny Mother's request for judicial notice for several reasons. First, we are not persuaded that the entire contents of a government Web site are facts "not reasonably subject to dispute" or "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (See Evid. Code, § 452, subd. (h).) In particular, there appears to be substantial controversy regarding the existence or nature of Lyme disease and Morgellons. Second, even if the Web site were deemed an official act of a government executive department as urged by Mother (see Evid. Code, § 452, subd. (c)), we could take judicial notice only of the existence of the site's contents, not the truth of those contents. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.) Third, we do not ordinarily consider facts that were not before the trial court when it made the orders under review. (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632.) Finally, the parties' dispute about the nature and appropriate diagnosis for Lyme disease and Morgellons is relevant only to the reasonableness of Mother's services and the need to remove the children from her custody—issues we need not address for reasons stated *post*. (See *Mangini*, at p. 1063 [only relevant material is a proper subject of judicial notice].) In any event, Mother apparently wants us to take notice of the fact that the Web page discussing the Morgellons study is "outdated." Given that the printout in the record clearly states, "This website is archived for historical purposes and is no longer being maintained or updated," no additional evidence is needed to make that point.

Department recommended that the juvenile court declare the children dependents, place them with Father, offer Father family maintenance services, and offer Mother family reunification services.

In a January 2015 addendum to the disposition report, the Department reported Father was fully cooperating with the Department and providing the children with a safe and loving home. He agreed to have the children tested for Lyme disease. The children had "an emotional attachment" to Father and a "strong attachment" to Mother. The social worker investigated Mother's allegations of emotional and psychological abuse by Father, but found no evidence substantiating the allegations. The Department also changed its recommendation to termination of jurisdiction: "Based on the . . . complexity of [Mother's] condition . . . and [M]other's statement [about] the medical care and support she needs, the Department is unable to recommend that there is a substantial probability that the children would be able to return to the care of [Mother] in six months and that offering reunification services to [Mother] would be in the best interest of the children." The addendum further stated: "It is the understanding of the Department that [M]other's medical treatment, support systems and best resources for her condition are located in the [Bay Area] and therefore continued court jurisdiction with the family [in Humboldt County] would prevent [her] from receiving necessary medical treatment. It also appears that [M]other's family resides in the [Bay Area] and [she] would be able to maintain stable housing [there]. . . . [T]his would allow her to obtain custody of her children through the Family Law Court at a later date . . . . [¶] . . . [¶] Pending resolution in the family law court, the [D]epartment respectfully recommends the children remain released to [Father] and [Father] maintain sole legal and physical custody of the children and [M]other be provided weekly supervised visits . . . ."

In a March 2015 addendum, the Department again reported the children were safe and thriving in Father's care. Father had sought out counseling to better address Son's "questions about [Mother] and the grief and loss he is experiencing." Mother submitted evidence of abnormal thyroid levels and possible Lyme disease, and she asked that the children be tested for abnormal thyroid levels in addition to Lyme disease. She continued

6

to express the importance of her medical treatment in the Bay Area. The Department asked the juvenile court to maintain jurisdiction for 90 days so Lyme disease testing could be completed on the children, but it did not recommend thyroid testing.

In a May 2015 addendum, the Department reported Mother had not provided any evidence of participation in services. She had moved out of Humboldt County and had little to no contact with the Department. She missed 14 of 28 possible visits; she did not call or show for four visits and cancelled 10 due to transportation or health issues. She also failed to appear at a mediation session in April. The children tested negative for Lyme disease. In conclusion, the Department stated: "It is clear that [Mother] has not addressed her mental health or her substance abuse issues which continue to impact her ability to appropriately and safely parent her children. The Department respectfully recommends that the children remain in [Father's] care and [Mother's] visits continue to be supervised."

The juvenile court held a contested disposition hearing and admitted, among other exhibits, the public health nurse's reports in the dependency proceedings and the entire record of the pending family court dissolution case. Mother testified she had more than 20 years of experience in the medical field, including work as a nurse in birthing centers and a neonatal intensive care unit. She said she tested positive for Lyme disease but acknowledged the laboratory that conducted her tests did not follow CDC diagnostic standards. Regarding the "glowing green" statement, Mother said, "[W]hen we were in the hotel in Cloverdale, she had removed the drain cover from the tub, and all of this black slimy mold went in the water. . . . [W]e were woke up about three hours later with a call from my son's physician in UCSF, and . . . I was half asleep, and that's where that report came from." Mother said that sometime after August 2014 she had "lost [her] medications when [she] was put on Medi-Cal because her physician [did] not accept that," and she tested positive for methamphetamine because a friend gave it to her to use in emergencies for her sleep disorder. The first time Mother used methamphetamine was in December *after* Daughter's removal because she was feeling "down and out," and she had not used it since that incident. She did not use it when she breastfed. She did not

7

recall telling her children's pediatrician on December 5, 2014, that she had used methamphetamine and marijuana a month earlier. Mother testified that her other positive drug results were probably attributable to a nighttime medication she used for pain or leftover prescription Xanax she took occasionally to help her sleep. She acknowledged using medical marijuana for 13 to 15 years. She acknowledged testing positive for marijuana in February 2015, submitting a diluted test sample in January, and missing one drug test. Mother did not believe she needed substance abuse or mental health treatment because she had a bacterial infection that could cause mental symptoms when she was under extreme stress. However, she agreed to undergo a mental health and substance abuse assessment if ordered by the court.

At the time of the May 2015 hearing, Mother lived in the Bay Area with her grandmother, who had room to house the children. Mother lived on disability benefits and had applied for long-term Social Security benefits and food stamps. Mother's participation in visitation had dropped off due to her transportation difficulties and health problems. She had no place to stay in Humboldt County, and she had no means of transportation because her car was taken while parked outside Department offices during a supervised visit. She asked for the vehicle's return in a family court proceeding but the matter was still unresolved. In the meantime, she used mass transit or a rental car to visit the children. She never asked the Department for transportation assistance.

Mother wanted protection from stalking by Father. She sought a restraining order in the family court, but withdrew the request "[b]ecause I didn't feel that that piece of paper would really protect me and [Father] would get other people to do what he couldn't do if I had it."

Social worker Diana Rodriguez testified that her concerns about Mother's mental health were based on Mother's behavior in early December 2014, and Mother's "really long e-mails about her condition and about the case, which are really concerning, especially because she was aware that all of those e-mails were going to be presented to the Court. . . . [¶] . . . [¶] She was threatening to take action against mostly [Father]. She also threatened that she believed that the Department has something to do with what was

8

going on, . . . family law, her car . . . ." Mother further alleged the Department was making her children sick because they were not being treated for Lyme disease. Rodriguez frequently had to repeat herself when speaking to Mother. During visits, Mother took pictures of Daughter's vaginal area even after she was instructed not to do so. Daughter's pediatrician had never seen signs that she might be suffering from Lyme disease, and ultimately both children tested negative for the disease.

Rodriguez investigated Mother's allegations of domestic violence by Father and found no evidence to support them. She had no concerns about the children's safety in Father's care and came to believe Mother was not a reliable reporter. Rodriguez testified that Mother seemed relieved to learn the Department recommended termination of jurisdiction because she did not think she could both treat her Lyme disease and reunify with her children.

In a June 1, 2015 order, the court removed the children from Mother based on a finding by clear and convincing evidence that they faced a substantial danger to their physical or emotional well-being if left in her care. "[Mother] has a pattern of avoidance in obtaining offered mental health and drug/alcohol assessments, punctuated by documented symptoms and objective findings of diagnoses of Lyme's Disease and Morgellon's Disease. Reasonable services have been offered to [Mother], but she refused them. . . . The evidence strongly suggests that she resorted to methamphetamine use when she decompensated after losing her access to the various medications she was prescribed, including medication to manage her narcolepsy. The testimony and documentary evidence are clear and convincing that [Mother's] mental health, physical health and alcohol or drug issues continue to interfere with her ability to safely parent her children. [Mother's] record of failing to timely communicate when she was going to miss a visitation . . . or the mediation session . . . demonstrate[s] ongoing conduct which is contrary to safe parenting." The court found the Department had made reasonable efforts to return the children to Mother's care.

The court also found continuing juvenile court supervision was not necessary: "The goal of dependency proceedings is to reunify the children with at least one parent,

9

and that has been accomplished." "While the Court is troubled by some of the allegations by [Mother] in the dissolution case, which, if true, would be cause for concern in fashioning appropriate orders in the family law case, [Mother] dismissed her domestic violence petition before there were any findings in the family law case. There was no evidence that the [D]epartment identified issues or concerns with placement with the non-offending father since the cases were filed."

The juvenile court declared the children dependents and placed them with Father subject to Department supervision. It then granted Father sole physical custody of the children pending resolution of the family court case. The court denied reunification services to Mother after finding there was no substantial probability the children would be returned to her care. It granted Mother supervised visitation once or twice a week for three hours at a time, but barred her from photographing the children without clothing. Mother was to have open access to communicate with the children by phone, social media, or video conferencing media. The court then terminated jurisdiction. Mother appealed the jurisdiction and disposition orders and the order terminating dependency jurisdiction.

## II.    DISCUSSION

Although Mother's notice of appeal encompassed the jurisdiction, disposition, and termination of jurisdiction orders in their entirety, she expressly declines here to challenge the jurisdiction findings or the decisions to remove the children from her care and place them with Father. She challenges only the juvenile court's decision to terminate jurisdiction and services.

A.    *Mootness*

As a preliminary matter, we address the Department's argument that Mother's appeal is moot "there has been a final stipulated judgment . . . which disposes of the issues raised on appeal. . . . The judgment makes the family law court—not the

10

dependency court—the appropriate forum to address any issues which relate to [Mother's] custody and visitation rights."[4] We disagree.

"As a general rule, it is a court's duty to decide ' " 'actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " ' [Citation.] An appellate court will dismiss an appeal when an event occurs that renders it impossible for the court to grant effective relief."[5] (*In re N.S., supra,* 245 Cal.App.4th at pp. 58–59; see *id.* at p. 59 [rejecting as inapplicable to current statutory scheme the oft-stated standard that a dependency appeal is "not moot *if* the purported error is of such magnitude as to infect the outcome of the ensuing . . . termination action *or* where the alleged defect undermines the juvenile court's initial jurisdictional finding"].) "[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*Id.* at p. 60; see *In re Michelle M.* (1992) 8 Cal.App.4th 326, 328–329.)

---

[4] The Department asks us to take judicial notice of a February 2016 judgment and notice of entry of judgment filed in Mother's and Father's family court dissolution case. The judgment recites that there was an "Agreement in court" and Mother and Father were present. The judgment dissolved the marriage, divided the marital property, provided for child and spousal support and payment of attorney fees, continued the juvenile court's custody and visitation orders, and provided that Mother "may not move for modification of child custody or visitation without first filing proof of attendance at the Children of Divorce Workshop." The Department correctly notes that these court documents are proper subjects of judicial notice pursuant to Evidence Code sections 452, subdivision (d), and 459, and it persuasively argues the documents are relevant to its mootness argument. (See *Mangini v. R. J. Reynolds Tobacco Co., supra,* 7 Cal.4th at p. 1063.) Therefore, we grant the Department's request for judicial notice.

[5] The Department wisely does not argue that the order terminating the juvenile court's jurisdiction itself mooted this appeal, as Mother remained subject to adverse exit orders. (See *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548; see also *In re N.S.* (2016) 245 Cal.App.4th 53, 60, fn. 3 [despite juvenile court's termination of jurisdiction, appellate court has jurisdiction over appeal]; cf. *In re N.S.*, at p. 61 [termination of juvenile court jurisdiction mooted appeal because exit order was *not* adverse to appellant].)

11

Mother argues the juvenile court should have continued jurisdiction and provided continuing services to facilitate her visitation with the children. Child welfare services may be ordered only by the juvenile court, not the family court. (§§ 361.5, subd. (a), 362, subd. (c), 16501.) Therefore, Mother's apparent stipulation to the February 2016 custody and visitation order in family court did not constitute a waiver of her request for or entitlement to services, and she could possibly obtain relief in this appeal (an order for services) that could not be obtained in the family court proceeding. Mother also seems to contest the adequacy of the juvenile court's exit orders on appeal. The family court's discretion to modify the exit orders was and continues to be constrained: a family court may not modify a juvenile court's exit orders unless it finds "there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child." (§ 302, subd. (d); see *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 101, 103.) The family court in fact continued the juvenile court's exit orders with one *additional* restriction on Mother's visitation. Again, Mother could possibly obtain relief in this appeal (revision of the exit order) that she could not obtain in the family court proceeding. We therefore reject the Department's argument that this appeal should be dismissed as moot.[6]

B.     *Termination of Jurisdiction and Exit Orders*

In its June 1, 2015 order, the juvenile court removed the children from Mother's custody based on a finding by clear and convincing evidence that they faced a substantial risk of harm if returned to her care. Mother expressly declines to challenge that removal order. After removal, the juvenile court had to determine whether the children could be placed with another parent. The parties agree that Father was the noncustodial parent of Daughter and a second custodial parent of Son, who was in Father's care at the time of his removal from Mother. Because the applicable standards differ for custodial and noncustodial parents, we consider each child's case separately.

---

[6] The Department cites cases addressing the family court's power to modify juvenile court exit orders, but these authorities do not directly address the mootness question and do not alter our analysis.

1. *Daughter*

In Daughter's case, the court was required by section 361.2, subdivision (a) to "first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Pursuant to this statute, the court placed Daughter with Father. As noted *ante*, that decision is not challenged on appeal.

The court then was faced with three alternatives: order the noncustodial parent to assume custody of the child, terminate juvenile court jurisdiction, and enter a custody order (§ 361.2, subd. (b)(1)); continue juvenile court jurisdiction and require a home visit within three months, after which orders could be made as provided in subdivision (b)(1), (2) or (3) of section 361.2 (*id.*, subd. (b)(2)); or order reunification services for either or both parents and determine at a later review hearing which parent, if either, shall have custody of the child (§ 361.2, subd. (b)(3)). (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1243.) The court followed the option in section 361.2, subdivision (b)(1), by granting custody to Father with prescribed visitation rights for Mother and terminating jurisdiction. Mother argues the court should have maintained jurisdiction and provided her additional services. That is, she argues the court should have chosen the section 361.2, subdivision (b)(3) option. Specifically, she wanted services to assist her with arranging visits and enforcing the exit order. We thus consider whether the court erred in proceeding under section 361.2, subdivision (b)(1).

Decisions about how to proceed under section 361.2, subdivision (b)—including whether to grant either parent services or terminate jurisdiction, as well as the content of exit orders—are committed to the juvenile court's discretion. (See *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179; *In re Maya L.* (2014) 232 Cal.App.4th 81, 102.) The standard guiding the court's exercise of this discretion is whether a need exists for continuing juvenile court supervision, considering the child's best interests. (*In re*

13

*John M.* (2013) 217 Cal.App.4th 410, 421; see *In re Michael W.* (1997) 54 Cal.App.4th 190, 195 [juvenile court's best interest analysis differs from that of the family court].) The ultimate question is who should have custody of the children. (*John M.*, at p. 421.) " 'If the previously noncustodial parent can provide a safe and stable permanent home for the child and the evidence establishes that the other parent cannot, reunification services may be offered only to the previously noncustodial parent since this serves the Legislature's goals by placing the child in parental custody and providing for a safe and stable permanent home for the child. . . . [¶] If, on the other hand, the previously noncustodial parent who is now assuming custody does not appear to be an appropriate permanent placement for the child, and the previously custodial parent has the potential to provide a safe stable permanent home for the child, reunification services can be offered to the previously custodial parent in the hope that this parent will remedy his or her deficiencies and reunify with the child. . . . [¶] . . . [¶] . . . ". . . [T]he purpose of reunification services is to facilitate the return of a dependent child to parental custody." [Citations.] . . . When a child is placed in nonparental custody, reunification services are necessary to promote a possible return of the child to parental custody. However, when a child is placed in parental custody, this goal has already been met and therefore reunification services are not necessary.' " (*In re Karla C., supra,* 186 Cal.App.4th at p. 1244.)

Here, the juvenile court reasonably found the children were in a safe and stable placement with one of their parents, and thus continuing juvenile court supervision was not needed. Father had a pre-existing relationship with the children, and he was consistently observed to act appropriately with them. The children were thriving in his care and had an "emotional" and "healthy" attachment to him. Son's single comment concerning Father's "meanness" early in the dependency case turned out, upon probing, to be nothing more than dissatisfaction with Father's nonphysical discipline techniques, about which the Department apparently had no concerns. All other allegations of domestic violence originated with Mother and could not be corroborated by other family friends or police reports. Father was "soft spoken and kind" in his interactions with the

14

social worker. He denied the allegations of abuse, but nevertheless agreed to participate in any services the Department thought would help him appropriately parent the children, and he voluntarily engaged in therapy to help Son deal with his separation from Mother. The social worker ultimately concluded Mother was not a reliable reporter, and the court similarly found Mother to be lacking in credibility. Mother's allegations of harassment and interference with her visitation during the dependency case were supported only by Mother's statements. In light of the Department's inability to corroborate the abuse allegations, the juvenile court reasonably could have rejected the harassment and interference allegations as lacking in credibility as well. Because no evidence was before the court that the children were not safe in Father's home or that Father would interfere with Mother's visitation rights under the exit orders, the court did not abuse its discretion in awarding custody to Father and terminating jurisdiction.

Significantly, Mother's request for additional services was not premised on a need to protect the children; instead, she sought financial assistance (including legal representation) to assist her in maintaining visitation. It is not appropriate, however, to use juvenile court resources to subsidize parents' engagement in a custody dispute. "The juvenile courts must not become a battleground by which family law war is waged by other means. It is common knowledge that the resources of local government social service agencies are stretched thin; in the juvenile dependency context those resources are manifestly intended to be directed at neglected and genuinely abused children. [¶] Moreover, the misuse of the juvenile dependency system to litigate custody battles is not only unfair to taxpayers, but to litigants as well. . . . [A] litigant may be unfairly prejudiced in a custody fight when the battlefield is shifted to the juvenile courts. At that point he or she faces not only an embittered ex-spouse, but a government adversary paid at public expense." (*In re John W., supra,* 41 Cal.App.4th at p. 975.)

Mother argues it would be in the children's best interest to preserve their relationship with her, and therefore it was an abuse of discretion for the court to terminate services and issue exit orders failing to account for either Father's alleged interference with her visitation or her health problems that impeded her ability to maintain visitation.

However, the family court was equally well-positioned to preserve the children's relationship with Mother by considering modification of the custody and visitation orders based on these concerns. (§ 302, subd. (d).) Also, for the reasons stated *ante*, the juvenile court reasonably could have found there was no reason to anticipate that Father would interfere with Mother's visitation rights. Accordingly, Mother has not demonstrated on appeal that "the relatively heavy hand of the juvenile court was needed." (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1081–1082 [although goal of dependency proceedings is to ensure child's safety and preserve family relationships, court's award of custody to father with visitation for mother and termination of jurisdiction was not an abuse of discretion where the record demonstrated father's cooperation with mother's visitation].)

Mother argues the juvenile court erred by terminating jurisdiction without a finding that she was provided or offered reasonable reunification services.[7] She devotes a substantial portion of her appellate brief to arguing she did not receive reasonable services. It is well established, however, that a reasonable services finding is not a prerequisite to terminating jurisdiction under section 361.2, subdivision (b) (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1454), as the provision of services is discretionary once a section 361.2, subdivision (a) placement has been made (*In re Karla C., supra,* 186 Cal.App.4th at p. 1244). Thus, we need not review the Department's provision of services.

Finally, some of Mother's arguments suggest she also challenges the content of the exit orders. For example, she refers to a need for a neutral person to facilitate visitation because of supposed interference by Father. However, as discussed *ante*, substantial evidence supports the juvenile court's implied finding that Father would not interfere with Mother's visitation rights under the exit orders; so we cannot conclude the court abused its discretion in not adopting modified orders.

_____

[7] Because Mother expressly declines to challenge the removal order, we need not address her apparent argument that the court's reasonable services (i.e., reasonable efforts; see § 361, subd. (d)) finding was not supported by substantial evidence.

16

2.    *Son*

The juvenile court needed to determine if formal removal could be avoided by allowing a nonoffending custodial parent to retain physical custody of Son after presenting an adequate safety plan to protect him from the risk of harm posed by Mother. (§ 361, subd. (c)(1)(B).)  Consistent with this statute, the court granted custody of Son to Father.  Again, this decision is not challenged on appeal.

In a section 361, subdivision (c)(1)(B) case, the provision of services is governed by section 362, subdivision (c), and the conduct of review hearings and the decision whether to terminate dependency jurisdiction is governed by section 364.  (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20 [citing former § 362, subd. (b), predecessor of current § 362, subd. (c), as amended by Stats. 2012, ch. 130, § 1.)  At review hearings, the court's focus is on "determining 'whether the dependency should be terminated or whether further supervision is necessary.'  [Citations.]  This is so because the focus of dependency proceedings 'is to reunify the child with *a parent*, when safe to do so for the child.' " (*Pedro Z.*, at p. 20.)  Whether to grant services to the parent who no longer has custody of the children is committed to the discretion of the court.  (See *In re Gabriel L.* (2009) 172 Cal.App.4th 644, 651 [where child was returned to care of one parent, provision of services to other parent under § 364 was discretionary].)  In sum, the standards governing the court's decision to provide services, terminate jurisdiction, and fashion exit orders with respect to Son, who was placed with Father pursuant to section 361, subdivision (c)(1)(B), and with respect to Daughter, who was placed with Father pursuant to section 361.2, subdivision (a), were very similar.[8]  (See *Gabriel L.*, at

_____

[8] The Department notes the statutory standard for terminating jurisdiction under section 364 is different from the standard in section 361.2, subdivision (b).  Section 364, subdivision (c) provides:  "The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn."  This language is not in section 361.2, subdivision (b).

The express statutory standard of section 364, which usually applies in cases where the child was never removed from the offending parent's care, anticipates that

p. 651.)  We conclude that our analysis of Mother's claims with respect to Daughter applies equally to Son's dependency case.

### III.   DISPOSITION

The judgment is affirmed.


                  _____

                  BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

SIMONS, J.

---

termination of jurisdiction would leave the child in the care of the former offending custodial parent.  In such cases, jurisdiction should not be terminated unless the offending parent has resolved the problems that led to the dependency and no similar problems have arisen.  When the child has been placed with a *nonoffending* custodial parent pursuant to section 361, subdivision (c)(1)(B), on the other hand, the pertinent question before the court is whether continuing supervision is necessary—i.e., whether custody of the child may be granted to at least one parent who can keep the child safe.  Stated differently, conditions justifying assumption of jurisdiction no longer exist because the child has been safely placed with a nonoffending parent.